282 P.2d 791

**L. B. STALLCUP, Appellant,**

v.

**Paul J. COSCARART, Appellee.**

No. 5869.

Supreme Court of Arizona.

April 26, 1955.

Rehearing Denied June 1, 1955.

Shimmel, Hill & Hill, Phoenix, for appellant.

Fennemore, Craig, Allen & Bledsoe, Phoenix, by Philip E. von Ammon, Phoenix, for appellee.

PHELPS, Justice.

Paul Coscarart, hereinafter called plaintiff, brought suit against L. B. Stallcup, oral surgeon, hereinafter called defendant, to recover damages for alleged malpractice by the defendant upon the person of plaintiff. The alleged malpractice is based upon the postoperative care of plaintiff after the extraction of four wisdom teeth. The case was tried to a jury which returned a verdict in favor of plaintiff in the sum of $25,500. Judgment was rendered on the verdict and after the usual motions were overruled, this appeal was taken.

The plaintiff was placed under an anesthetic known as sodium pentathol and was operated upon at 10 o'clock in the morning of February 5, 1951. The operation was performed in about 18 minutes. Plaintiff was then conveyed to a retiring or recovery room where he remained until between 4:30 and 5 o'clock in the afternoon at which time he was removed to the home of his mother-in-law in Phoenix. From there, because of his apparent critical condition, his wife telephoned Doctor Leslie Smith who came at once, arriving between 6:30 and 7:00 p. m.

Doctor Smith examined the patient and found that he was running a temperature of about 104 degrees with acute pneumonia, had blood in the corners of his mouth, was coughing and had a rattle in his chest. His impression was that the patient was suffering from some infection in the lungs. It was Doctor Smith's opinion that plaintiff's condition was in no way related to his diabetes.

The plaintiff was immediately taken to Good Samaritan Hospital and his condition was diagnosed as aspiration pneumonia as the result of having inhaled blood. This diagnosis was corroborated by the fact that the patient during each of the following two days, expectorated old clots of blood.

On February 10 the plaintiff developed an abscess or cavity in the lungs which was filled with pus. This condition persisted after he left the hospital on February 17. He was sent to the home of his mother-in-law to rest in bed. After five or six weeks, he returned to his farm in Gilbert where he was bedridden until early July except for trips to the doctor.

In July some incubation tests of plaintiff's sputum revealed positive evidence of the development of tuberculosis and he was placed in St. Luke's Hospital on July 12, 1951. He remained there under constant treatment until the following October 15.

In April of 1952, he was permitted by Doctor Smith to do some light overseeing work but was still required to rest in bed

for a prescribed period during each day. In February of 1953 an x-ray examination indicated that the lung abscess was developing again, and the plaintiff was required to remain in bed all the time. The postoperative care given plaintiff while in defendant's office will be hereinafter given by detailing the pertinent portions of the testimony of the witnesses both for plaintiff and defendant.

There are eight assignments of error presented to us on this appeal. Assignment No. 1 charges that the court erred in denying defendant's motion made at the close of plaintiff's case and renewed by post-judgment motion for an order directing the jury to return a verdict for defendant for the reason that plaintiff adduced no evidence proving or tending to prove the standard of postoperative practice customarily exercised by oral surgeons in the community of Phoenix, or the degree of skill and care ordinarily and customarily exercised by such surgeons, and that plaintiff produced no evidence tending to prove a departure by defendant from any standard of practice or of care and skill to which defendant was required to adhere.

Assignments 2, 3, 4, 5, 6 and 7 were all directed at the giving, modifying and refusing instructions requested by plaintiff and defendant.

Assignment No. 8 is based upon the court's denial of defendant's alternative motion for a new trial upon the ground that the verdict was so excessive as to appear to have been given under the influence of passion and prejudice. This assignment was not argued in the brief and will therefore be considered as having been abandoned.

Assignment No. 1 goes to the sufficiency of the evidence to support the judgment. Under well-established rules where the sufficiency of the evidence to sustain the judgment is questioned we must, in considering whether the judgment entered was proper, resolve every conflict in the evidence and every inference which can reasonably be drawn therefrom in favor of plaintiff. In other words, we must view the evidence in a light most favorable to sustaining the verdict and if there is any substantial evidence from which reasonable men could have found ultimate facts to be such as will sustain the verdict, the judgment will be affirmed. Curlee v. Morris, 72 Ariz. 125, 231 P.2d 752.

Before entering upon a discussion of the evidence in this case we believe it would be profitable to refer to some of our previous decisions bearing upon the character of evidence necessary to support a judgment in this kind of an action. We said in Boyce v. Brown, 51 Ariz. 416, 77 P.2d 455, 457:

"* * * One licensed to practice medicine is presumed to possess the degree of skill and learning which is possessed by the average member of the medical profession in good standing in the community in which he prac-

tices, *and to apply that skill and learning, with ordinary and reasonable care, to cases which come to him for treatment.* If he does not possess the requisite skill and learning, or if he does not apply it, he is guilty of malpractice. * * *" (Emphasis supplied.)

We also said in that case:

"* * * The accepted rule is that negligence on the part of a physician or surgeon, by reason of his departure from the proper standard of practice, must be established by expert medical testimony, unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it. * * *"

The court cited as authority for this Herzog, Medical Jurisprudence, Sec. 192; Butler. v. Rule, 33 Ariz. 460, 265 P. 757, and 48 C.J. 1150; 70 C.J.S., Physicians and Surgeons, § 62.

It was said in the case of Lashley v. Koerber, M.D., 26 Cal.2d 83, 156 P.2d 441, 444, in quoting from Engelking v. Carlson, 1939, 13 Cal.2d 216, 220, 221, 88 P.2d 695, 697, that:

"* * * 'The law has never held a physician or surgeon liable for every untoward result which may occur in medical practice. It requires only that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality and that he shall use ordinary care and diligence in applying that learning and skill to the treatment of his patients. (Citation). Whether he has done so in a particular case is a question for experts and can be established only by their testimony. (Citations) * * *.' "

The court further quoted the following from Bickford v. Lawson, 27 Cal.App.2d 416, 421, 81 P.2d 216, 219:

"' * * * The question as to whether the reduction and treatment of a fractured limb without the use of an X-ray machine constitutes negligence, depends upon what an ordinarily skilled physician practicing in that vicinity, in the exercise of due care and professional judgment, would be required to do under like circumstances. The determination of those questions depends upon expert testimony. (Citations).' "

The court then said:

"The expert testimony which establishes plaintiff's prima facie case in a malpractice action may be that of a defendant. (Citations) * * *."

Defendant graduated from the University of Southern California in 1925. He qualified to practice dentistry both in California and in Arizona. He practiced dentistry until 1935 in Arizona and then, according to his testimony, took extensive courses under outstanding oral surgeons in different parts of the United States and since 1937, has been actively engaged in the practice of oral surgery in Phoenix, indicating that he is skilled and learned in his profession.

Defendant testified in detail both concerning the operation and postoperative treatment of plaintiff which was more or less corroborated by three office attendants or nurses. The testimony was to the effect that immediately after the operation plaintiff was administered penicillin at which time his pain reflex had returned. He was then conveyed to a retiring or recovery room and there placed upon a cot where he remained until 4:30 to 5 o'clock that afternoon; that he was placed on his right side and that he changed, or was changed from side to side at intervals, and at times would lie for a short time on his back; that it was preferred by defendant that the patient lie on his side; that Miss King, a registered nurse in California (but not registered in Arizona) remained with him from around 10:30 a. m. until about 12:00 noon; that defendant was in the room several times during that period, once at the request of Miss King to aid the plaintiff to the urinal. On each occasion he talked to the plaintiff by asking questions to which plaintiff responded in monosyllables which defendant said was usual for one in anesthesia. The airway, a contraption used to enable a patient to breathe freely during an operation, was removed from his mouth when plaintiff began to kick it out with his tongue. He stated that in anesthesia a patient, for the removal of teeth as in this case, is customarily given only a sufficient amount of sodium pentathol to produce deep analgia which is not a deep anesthesia as is required for major operations but the patient is merely anesthesiatized to the point where he loses his pain reflex and recollection of what has been done. He further testified that he was in the room several times between 12 o'clock noon and 3:00 or 3:30 p. m. at the time he finally left the office for the afternoon. He questioned the plaintiff concerning his condition. The plaintiff was still dopey and answered in one or two words. He said, however, that plaintiff was coming out of the anesthesia satisfactorily and could have left the office, if necessary, at that time. He stated the time in which a patient recovers from anesthesia ranges from a few minutes to several hours; that the length of time plaintiff remained under the effect of the anesthetic was not unusual but that he had had patients remain during the day and then be taken out in a wheel chair. He stated that just before leaving his office he and Miss King walked the plaintiff around the room. He said that postoperative care is largely attended to by the nurses.

Miss King, the nurse who attended plaintiff between 10:30 and 12 o'clock noon said plaintiff expectorated frequently and without difficulty during that period. Each of the nurses testified they were in plaintiff's room many times during the period from 12 o'clock noon until he was taken to the automobile to be conveyed home between 4:30 and 5:00 p. m.

■ Doctor Stallcup testified he knew of no postoperative standard of care in any other office than his own in this community.

Under the rule laid down in Boyce v. Brown, supra, and in Lashley v. Koerber, M.D., supra, to the effect that it will be presumed that one licensed in medicine will apply the skill and learning ordinarily possessed by physicians in good standing practicing in that community, with ordinary and reasonable care, to cases which come to them for treatment, we must presume that in narrating the postoperative care which defendant testified was given to plaintiff he intended to convey the fact that such treatment was performed with that reasonable care and skill to which defendant was required to adhere in this community, as measured by the above standard. And as was said in Lashley v. Koerber, M.D., supra, we may also

" * * * presume that defendant, in testifying will state his cause as favorably to himself as possible * *."

In Butler v. Rule, 29 Ariz. 405, 242 P. 436, 438, the reported facts are that the patient was given x-ray treatment for cancer. Doctor Butler and Doctor Callander, an x-ray expert, were the only experts who testified on the question of whether the treatment given by Doctor Butler was proper. Doctor Butler testified how he applied the x-ray to the diseased portion of the body and how he protected the adjacent area, stating the number of volts applied, that the target or focal point of the tube through which the x-ray was applied was placed 15 inches by measurement from the skin or surface of the growth and that the strength of the current applied was five milliamperes. This application was continued for thirty minutes.

The court said that if the treatment given was as Doctor Butler testified he fully met his legal obligations to the plaintiff. However, a lay witness testified that the target or focal point of the tube was placed only 10 to 12 inches from the skin or surface of growth. In discussing the matter the court said:

"A positive statement of the distance, arrived at by actual measurement, certainly should be taken against an estimate or guess and, if the question involved only which of the two methods was the more accurate, we would be willing to agree with defendant that no conflict was created. But the question also involves the veracity of the witnesses. The jury might have concluded defendant did not measure the distance at all, and that his statement that he did was not true. Where there is a conflict in the evidence, the weight and credibility to be given the witnesses is always a question for the jury * * *."

In the instant case the testimony of plaintiff's wife was to the effect that she was invited by the nurse into the recovery room to sit with her husband. This was about 12 o'clock, that when she went in he was then lying flat on his back held in position with straps. His face was swollen, flushed and very red; his lips puffed up; he was sweating profusely; his eyes were shut and he was moving his arms violently back and

forth. He continued to move for about 30 minutes after which he went limp and lay on his back, still. There was a little blood at the corners of the mouth. He remained in this position without change in his condition until he was taken home later in the day. He did not cough or expectorate from his mouth during that period. She stated that defendant came into the room one time, about 2 o'clock, took the pillow under plaintiff's head in his hands and shook it a little and said, "He is a tough son-of-a-gun, isn't he? Does he ever drink hard whiskey?" but he did not administer any treatment to plaintiff and apparently did or said nothing other than as above stated; that about one o'clock a colored girl came into the room and left some cleansing tissue and a little sputum bowl and towel. She told plaintiff's wife to watch him closely to see he didn't fall off. At about 3 o'clock a nurse came in and handed her a little slip of paper and said that she should have it filled for her husband. She testified that during the afternoon she raised plaintiff's eyelids up and his eyes were glassy and appeared to be looking at the ceiling. She was out of the room for about ten minutes on two occasions.

The fact situation in the instant case is strikingly similar to that in Butler v. Rule, supra, 29 Ariz. 405, 242 P. 436. Doctor Butler testified to what he did which he claimed was according to the standard treatment of the average physician in the community. A lay witness testified to facts in conflict therewith. Doctor Stallcup and his nurses testified to the postoperative treatment given which is presumed to comply with the standard of skill and care required of the average oral surgeon in Phoenix. Plaintiff's lay witnesses completely refuted defendant's testimony, creating a conflict. Here as in the Butler case the veracity of the witnesses was involved. The question presented was for the jury.

We believe defendant's testimony clearly established the care and skill required of an oral surgeon in Phoenix. Therefore it was not necessary for this standard to be established by other independent expert (medical) testimony. The testimony of plaintiff's wife and other witnesses, if true, shows a marked departure from the care and skill to which defendant was required to adhere. With respect to the testimony of plaintiff's wife concerning the postoperative care given plaintiff, defendant was asked the following questions:

"Q. If you were to believe everything that they said to be true (that is plaintiff's witnesses), then, there is no doubt, is there, that the care which was given, presuming what they said to be true, there is no doubt in your mind that the care that was given did not measure up to the standard for your profession at that time? A. Mr. von Ammon, I am not going to say my opinion on that because I can't imagine anyone following out the procedures that have been followed, that have

been stated here today, in the care of a patient, any man taking care of human beings.

"Q. It isn't conceivable to you that any professional person in the practice of dental surgery or anything else could have given the type of care that was described in this courtroom? A. I can't believe it.

\* \* \* \* \* \*

"Q. Dr. Stallcup, didn't you say just a moment ago that you could not believe that any professional man treating a human being would provide the type of care which was described by the witnesses in this courtroom? A. They might do it, but in my own heart, I can't believe it."

The above statement that the postoperative treatment claimed to be given according to the testimony of plaintiff's witnesses, was unfit to be administered to a human being, justified the jury, if they believed the testimony of plaintiff's wife and other witnesses, in finding that defendant's postoperative treatment of plaintiff was not in conformity with the standard in this community to which defendant is required to adhere and unless the court committed reversible error in instructing the jury, the judgment must be affirmed.

We have carefully studied all of the instructions given by the court and compared them with the instructions requested by both plaintiff and defendant as well as the rule of law upon the subject uniformly adhered to by all the courts and we confess we are unable to understand upon what theory the learned trial judge refused to define either "negligence" or "reasonable care" leaving the jury like a ship at sea without either rudder or compass. Certainly it could not have been upon the theory that the evidence concerning the postoperative treatment of plaintiff, considered in the light most favorable to plaintiff, was of such a character that defendant's negligence was so grossly apparent that a layman would have no difficulty in recognizing it, especially when the evidence on that question was in irreconcilable conflict.

Defendant requested the following instruction on negligence:

"You are further instructed that before an oral surgeon can be held liable for malpractice, he must have done something in his treatment of his patient which the recognized standard of good oral surgical practice in the community in which he is practicing forbids in such cases, or he must have neglected to do something which such standard requires. As applied to the case before you, this means that before the defendant, who specializes in oral surgery, can be held liable for the negligence alleged in plaintiff's complaint, he must have done something in his treatment of the plaintiff which is forbidden by the recognized standard of good oral surgery practice in the community of Phoenix, Arizona, or he

must have neglected to do something which such standard requires."

This is a perfectly good instruction and in the absence of some instruction defining negligence and an application of the pertinent facts thereto it constituted reversible error to refuse it. This is clearly the law in this state as enunciated in the decisions above cited. When negligence is an issue in the case it is the duty of the court to define it and apply the pertinent facts thereto whether requested to do so or not. Southwest Cotton Co. v. Ryan, 22 Ariz. 520, 199 P. 124; Reah v. Jupin, 68 Ariz. 335, 206 P.2d 558, 559; Riser v. Herr, 187 Okl. 211, 102 P.2d 178; Sartin v. Moran-Buckner Co., 189 Okl. 178, 114 P.2d 938.

In St. Louis Southwestern Ry. Co. of Texas v. Cox, Tex.Civ.App.1923, 248 S.W. 1101, 1103, involving the question of negligence, the court said:

"* * * Where it is necessary to allege and prove negligence, and the case is tried before a jury upon conflicting evidence, it is indispensible that the court in submitting the facts to the jury, whether on a general charge or special issues, should define negligence, and should also submit to the jury the question of fact as to whether or not the killing was caused through negligence."

The case involved the killing of cattle by the railroad.

Plaintiff requested the following instruction relating to the measure of skill and care to which a dentist is required to adhere in his profession:

"You are instructed that the law requires a professional man, such as a dentist, to have that skill and learning which is possessed by the average member of his profession in good standing, and to apply it with ordinary and reasonable care. While he, *is* a dentist, is not liable for mere error of judgment, nor does he guarantee a good result, he does promise to have and use the skill and learning of an average dentist, to exercise reasonable care, and to exert his best judgment to bring about a good result. A dentist who fails to exercise such care and judgment is guilty of negligence."

Although the above instruction is not entirely accurate in that it failed to limit the standard to the community in which defendant practiced the court deleted the other essential portions thereof tending to inform the jury by what standard they were to determine if defendant was negligent in his postoperative treatment of plaintiff. The instruction as given by the court reads as follows:

"A dentist is not liable for mere error of judgment nor does he guarantee a good result. He does promise to exercise reasonable care and to exert his best judgment to bring about a good result. A dentist who fails to exercise such care and judgment is guilty of negligence."

"Reasonable care" is a variable. What may be "reasonable care" under one set of circumstances may be "gross negligence" under another. "Reasonable care" standing alone, means nothing. The jury should have been told, as this court has frequently stated, that the law requires a professional man, such as a dentist, to possess that skill and learning which is possessed by the average member of his profession in good standing in the community in which he is practicing and to apply such skill and learning with ordinary and reasonable care. Phillips v. Stillwell, 55 Ariz. 147, 99 P.2d 104.

The court then stated in the above instruction that the dentist was required to exert his best judgment to bring about good results. It is readily apparent that the "best judgment of a dentist" unless measured by some standard, may vary with each individual engaged in the profession. In order to meet the requirements of the law, two things must concur. One, he must possess such skill and learning in his profession as is possessed by the average member of the profession in that community, and two, he must apply that skill and learning with reasonable care in discharging his obligations to one who comes to him for treatment. If he exercises reasonable care and skill in performing his professional duties we believe it necessarily follows that he exerts his best judgment. The court then told the jury if a dentist didn't exercise "reasonable care" and exert his "best judgment" he was guilty of negligence. This is the only attempt made by the court to define "negligence" in its instruction. It does not satisfy the law in cases of this character.

Judgment of the lower court is reversed and the cause remanded for a new trial.

LA PRADE, C. J., UDALL and WINDES, JJ., concur.

STRUCKMEYER, Justice (concurring in result).

The majority have concluded that this case must be reversed because the jury was not instructed on the law of negligence. I concur that the case must be reversed but I cannot agree that it was necessary or even proper for the jury to be instructed on negligence.

Negligence is the failure to exercise ordinary care. Ordinary care in malpractice is the degree of skill and care exercised by others practicing in the same profession in the same community. In this case the degree of skill and care exercised by other dentists was not proved nor was it sought to be proved. Generally in such circumstances the plaintiff has failed to show how the defendant's conduct was negligent; but here since the defendant admitted that the testimony for the plaintiff, if believed, was care unfit for human beings, there was no need to show how the defendant's conduct deviated from the standard of skill and care. The evidence for the plaintiff, if true, showed a lack of due care, a failure to conform to good medical practice, a want of

proper skill. Why? Simply because the defendant said so.

There was therefore no issue of negligence if the jury believed and found to be true all of the plaintiff's evidence. There was no issue of negligence if the defendant's evidence was believed for there being no testimony of the skill or care required of dentists, the legal presumption favoring the defendant arbitrarily compelled the conclusion that this, the defendant's evidence, was not negligence. On this state of the record it was possible for the jury to arrive at a verdict either for or against either party to this action simply by deciding wherein lay the truth. Since the only issue was whose purported facts spoke the truth, the trial judge did not err in refusing to instruct on negligence for without evidence of the standard of skill to guide the jury, it is impossible to arrive at a rational conclusion in regard thereto.

It is not difficult to understand why this case must be reversed. The defendant's admission [1] was conditioned and limited to the condition imposed by the question: "If you were to believe *everything* that they (plaintiff's witnesses) said to be true * * *". If the jury believed a part of plaintiff's testimony, less than everything, then the part which the jury believed, being less than everything, was not described as unfit for human beings and the trial court should have instructed that in such event the verdict must be in favor of the defendant.

1. The defendant testified on cross examination:

"Q. Dr. Stallcup, you have heard the testimony of Mrs. Coscarart and Mr. Coscarart here today, have you not? A. Yes, I have.

"Q. And the testimony of the sisters? A. Yes.

"Q. I take it that you do not agree that what they have described actually occurred, is that right? A. Not at all.

"Q. If one were to believe that everything that they said was true about the occurrence that day, there would be no question in your mind that the care that was given to this patient didn't measure up to just the minimum standard, would it? A. According to my observation, there is no doubt in my mind about it being true.

\* \* \* \* \*

"Q. * * * If you were to believe everything that they said to be true, then, there is no doubt, is there, that the care which was given, presuming what they said to be true, there is no doubt in your mind that the care that was given did not measure up to the standard for your profession at that time? A. Mr. von Ammon, I am not going to say my opinion on that because I can't imagine anyone following out the procedures that have been followed, that have been stated here today, in the care of a patient, any man taking care of human beings.

"Q. It isn't conceivable to you that any professional person in the practice of dental surgery or anything else could have given the type of care that was described in this courtroom? A. I can't believe it."

To the contrary, the trial court instructed the jury[2] to return a verdict in favor of the plaintiff if it believed that "*any* of the acts of negligence alleged in plaintiff's complaint"[3] were true. Each of the acts of negligence alleged in plaintiff's complaint is less than *everything* testified to by plaintiff's witnesses. For example, the plaintiff alleged that the defendant failed to provide a device or other means for removing blood from the plaintiff's mouth, plaintiff then being unconscious. The defendant did not admit that the testimony relating to this alleged act of negligence in and of itself constituted care unfit for human beings, but that the failure to provide such a device or other means constituted negligence only if the jury believed that in addition thereto plaintiff was restrained in a position that made it impossible for blood and other matter to be voluntarily expelled, and that the plaintiff was unconscious to the extent that his gag reflex was suppressed and that means were not employed to assist plaintiff to regain consciousness and that defendant or his

2. The court instructed:

"If under the evidence and the instructions of the Court you find by a preponderance of the evidence that the defendant was guilty of any of the acts of negligence alleged in the plaintiff's complaint, you must then determine whether such negligence, if any, proximately caused or contributed to cause any disease or damage which you may find was suffered by the plaintiff.

"The proximate cause of an injury is that cause which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the disease or damage and without which the result would not have occurred.

"If under the evidence and the instructions of this Court you find that the defendant, Lester B. Stallcup, was guilty of any of the acts of negligence alleged in the plaintiff's complaint and if you further find that such negligence, if any, proximately caused or contributed to cause any disease or damage to the plaintiff, then it becomes your duty to arrive at a sum of money which will adequately compensate the plaintiff for such disease or damage, if any.

"In arriving at such sum of money, if any, to which the plaintiff is entitled, you may take into consideration * * *".

3. The acts of negligence alleged:

"1—In that he caused plaintiff to be restrained in a position which made it difficult, if not impossible, for plaintiff to expel blood and other matter from his mouth voluntarily;

"2—In that he failed to provide a device or other means for removing blood and other matter from plaintiff's mouth, plaintiff then and there being unconscious;

"3—In that he failed to employ any means to assist plaintiff to regain consciousness;

"4—In that he failed to attend plaintiff while plaintiff was unconscious and was strapped to a bench as hereinabove set forth;

"5—In that he failed to provide to plaintiff the care and treatment usually and customarily provided to persons in plaintiff's condition of unconsciousness following the extraction of four wisdom teeth.

nurses failed to attend plaintiff while plaintiff was so restrained, unconscious, his gag reflex suppressed, and a device or other means was not used for removing blood and other matter.

Inasmuch as it is now impossible to determine the basis for the verdict of the jury, I am of the opinion this cause must be reversed with directions that the defendant be granted a new trial.